THE SOUTHERN NURSERY COMPANY, *Appellee,* v. THE WINFIELD NURSERY COMPANY, *Appellant.*

No. 18,132.

#### SYLLABUS BY THE COURT.

INTERSTATE SHIPMENT—*Undervaluation to Obtain Lower Rate— Limitation of Carrier's Liability.* A nursery company in Tennessee filled an order for a carload of nursery stock from a dealer in Kansas. In the absence of special instructions to the contrary, and under a custom understood and agreed upon by nurserymen, the shipment was undervalued to obtain a lower freight rate, under a classification permitting it, and a bill of lading was taken which limited the liability of the carrier accordingly. Some of the goods were injured by freezing while in transit, and upon arrival at their destination they were rejected. In an action for the price of the entire shipment, *Held:*

(1)——— *Seller Authorized to Follow Trade Custom in Billing Goods—Carrier Agent of Buyer.* The seller was authorized, in the absence of special instructions to the contrary, to ship in the usual and ordinary way. His authority extended no further than to take a bill of lading of the kind usual in such shipments, and the carrier did not become his agent to make delivery instead of the agent of the buyer because the liability preserved against the carrier by the bill of lading was not sufficient to meet the loss sustained.

(2)——— *Validity of Contract Limiting Liability of Carrier.* The shipment being interstate in character was governed by the federal law, and under the federal statutes and decisions an interstate carrier may by fair, open and reasonable agreement limit the amount recoverable by a shipper to an agreed value, understated for the purpose of obtaining the lower of two or more rates, proportioned to the amount of risk.

Appeal from Cowley district court. Opinion filed May 10, 1913. Affirmed.

*G. H. Buckman,* and *S. C. Bloss,* both of Winfield, for the appellant.

*Charles W. Roberts,* of Winfield, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The parties to this litigation are nursery companies, the plaintiff being engaged in business at Winchester, Tenn., and the defendant at Winfield, Kan. The plaintiff sued for the price of a carload of nursery stock shipped to the defendant, and recovered. The defendant appeals.

The trees comprising the shipment were injured by freezing while in transit. When they arrived at Winfield the defendant regraded them and those which were not merchantable were rejected. Payment of the price for the sound trees, less the expense of regrading and a proper proportion of the freight charges, was tendered and refused and the action was brought for the price of the whole shipment. One defense was that the plaintiff was responsible for the damage to the trees because it did not properly discharge its duty in preparing the shipment for transportation. This defense is not now of importance because the evidence relating to it was such that the finding of the jury may be sustained. Another defense was that the carrier to whom the plaintiff delivered the goods was the agent of the plaintiff and not of the defendant, with the result that title did not pass with delivery to the carrier and the defendant had the right to refuse to accept unmerchantable trees when offered to it at Winfield.

The facts are undisputed. In order to obtain a lower freight rate, under a classification permitting it, the plaintiff agreed with the carrier on a valuation of the shipment at three cents per pound, and the bill of lading restricted the liability of the carrier accordingly. At three cents per pound the value of the shipment was $480. Its actual value was $1784. The bill of lading acknowledged notice that the property would be received and transported without limitation as to value under a different classification but at a higher freight

rate. It is the custom, understood and agreed upon by nurserymen, for all shipments of nursery stock to be made under a valuation of three cents per pound, for the purpose of saving freight charges, unless positive instruction be given to the contrary. No such instruction having been given to the plaintiff, the goods were billed out according to the custom.

The defendant requested the court to instruct the jury that the carrier was the seller's agent to make delivery unless the seller took a shipping contract which adequately protected the buyer in case the goods were injured or lost in transit. The instruction was refused and the jury were advised that, if the shipment was made in the ordinary way at the usual rate without instruction from the defendant to do otherwise, the carrier was the agent of the defendant. The defendant contends that a contract to ship at a gross undervaluation to procure the benefit of a lower freight rate, although under a classification permitting it, is contrary to law and public policy, and consequently that a custom among nurserymen to ship under such contracts can not be recognized.

The instruction requested by the defendant was founded on a principle stated in Williston on Sales in the following language:

"The contract made with the carrier for the transportation of the goods must also be a proper one, having in view all the circumstances of the case. Generally a remedy against the carrier for failure to perform its common-law duty must be preserved." (p. 401.)

This principle was first given definite recognition in two English cases, *Clarke v. Hutchins*, 14 East, 475, decided November 8, 1811, by the court of King's Bench, Lord Ellenborough, the chief justice, rendering the opinion, and *Cothay v. Tute*, 3 Campbell, 129, decided December 13, 1811, by the same judge at nisi

prius. In the report of the case of *Clarke v. Hutchins* the facts are stated as follows:

"The defendant, who lived at Gosport, ordered goods from the plaintiff, who lived at Plymouth, and who sent them accordingly to the receiving house of a vessel trading for this purpose between the two places, the owners of which had published cards and sufficiently established a notoriety in the place, that they would not be answerable for any package above 5l. unless entered and paid for as such. The value of the goods sent in this instance was 51l., but the plaintiff made no special entry or payment pursuant to the notice. The goods in fact were never delivered to the defendant, and no further account was given of them, and he refused to pay for them, on the ground that by the plaintiff's neglect in not making a special entry of them pursuant to the notice, he could have no remedy over against the carriers. Whereupon the plaintiff brought assumpsit for goods sold and delivered, &c., which was tried before Graham B. at Exter, when the plaintiff insisted upon the delivery to the common carriers as an execution of the order on his part, and that he was not bound to incur any additional expense by making a special entry, without the direction of the defendant, to whom it properly belonged: the learned judge however was of a different opinion, and nonsuited the plaintiff." (p. 475.)

On a motion to set aside the nonsuit is was contended that:

"The plaintiff had strictly performed all that he had authority to do by the generality of the order, by having deposited the goods in the usual and ordinary way, to be forwarded by the common carriers. There was no evidence of any prior dealings between the parties, from whence a more special authority might have been implied to warrant the plaintiff in charging the defendant with an extra price for the carriage." (p. 475.)

The court said:

"The plaintiff can not be said to have deposited the goods in the usual and ordinary way, for the purpose of forwarding them to the defendant, unless he took the usual and ordinary precaution, which the notoriety of the carriers' general undertaking required, with respect

to goods of this value, to insure them a safe conveyance; that is, by making a special entry of them. He had an implied authority, and it was his duty to do whatever was necessary to secure the responsibility of the carriers for the safe delivery of the goods, and to put them into such a course of conveyance, as that in case of a loss the defendant might have his indemnity against the carriers." (p. 476.)

In the report of the case of *Cothay v. Tute* the facts are stated as follows:

"The plaintiffs are dry-salters at London, the defendants dyers at Leeds. In December, 1809, the defendants wrote a letter to the plaintiffs, desiring them to send down 60 lbs. more of cochineal by the first coach. The plaintiffs accordingly delivered this quantity of cochineal at the Bull and Mouth inn, to be carried to the defendants by a coach that runs from thence to Leeds. At the coach office there was a notice stuck up, saying that the proprietors would not be answerable for any package above the value of 5l., unless entered as such, and paid for accordingly. This cochineal was not so entered, although worth about 150l.; and it was lost on the way to Leeds. There was no evidence of the manner in which the former cochineal had been sent." (3 Campbell, 129.)

The defendants insisted that:

"They were not liable, as the plaintiffs had not given them a remedy over against the carrier. The plaintiffs must be taken to have been aware of the notice, as well as of the law upon this subject. It was, therefore, their duty to have entered the cochineal as above the value of 5l. Without this, there was no sufficient delivery to the carrier to charge the defendants; and as they had derived no benefit, so they were not liable to make any compensation." (p. 129.)

The court said:

"The point made does not properly arise in this cause. The defendants order 60 lbs. more of cochineal to be sent them. It was therefore incumbent upon them to show how the former parcel was sent, and whether it was entered and insured as above the value of 5l.— Upon the general question I am not now called upon to

Nursery Co. v. Nursery Co.

give any decisive opinion; but as it is in practice so unusual under these notices to enter and insure goods as above the limited value, I shall be inclined to hold that the vendor is not bound to do so, without express instructions for that purpose. Were he to insure of his own accord with the carrier, how far would the purchaser be liable for the heavy additional expense thus incurred?—In this case the plaintiffs are clearly entitled to a verdict for the value of the goods." (p. 129.)

Williston (p. 402) also cited *Buckman v. Levi*, 3 Campbell, 414, decided by Lord Ellenborough at nisi prius June 17, 1813, in support of his text, but in that case the judgment was rested on the fact that the goods had not been delivered to the carrier.

It will be observed that in each of the cases quoted from the carrier lost the goods and the buyer was left without remedy against the carrier because a proper shipping contract had not been made. The general rule that delivery to the carrier constitutes delivery to the buyer is so well established that it ought not to be subject to innovations except when substantial rights and not merely theoretical considerations are involved. In this case the answer did not charge negligence on the part of the carrier, resulting in damages which could not be recovered because of restrictions in the bill of lading. So far as appears, the carrier properly performed its duty and the limitation of its liability did not affect the remedy of the defendant. It is not necessary to decide the question now, but the court is inclined to doubt that the relation of the carrier to the buyer is changed by the neglect of the seller to preserve to the buyer a remedy for loss or injury in transit when the carrier properly performs its function as an agent to deliver.

In *Clarke v. Hutchins* the opinion assumes it to be the law that the seller discharges his duty to the buyer when he deposits the goods with the carrier in the usual and ordinary way, taking the usual precautions to in-

sure safe conveyance. The decision was that in view of the notoriety of the carrier's rule not to be answerable for packages above five pounds in value unless specially entered, ordinary precaution required the seller to make a special entry of such a package and that he had implied authority to do so. In *Cothay v. Tute* the distinguished judge took notice of the fact that it was unusual with shippers to make special entries of goods above the value limited in the carrier's notice and expressed his inclination to hold that the seller was not bound to do so without special instructions. The order was for more goods, and in the absence of proof that the goods previously forwarded were specially entered at the higher rate no duty to the buyer was violated by not making a special entry of the second order. The two decisions concur, therefore, in holding that the seller is authorized, in the absence of special instructions, to ship according to the usual and ordinary method and that he discharges his duty to the buyer when he does so. There is no doubt that such is the law.

In this case there is no dispute that nursery stock is to be shipped at a valuation of three cents per pound in order to obtain a lower freight rate, under a classification permitting it, unless positive instructions to the contrary are given. The seller's authority, therefore, extends no further than to take a bill of lading of the kind usual to such shipments, if contracts of that character may lawfully be made. The shipment being interstate in character the federal law governs, and the precise question presented has very recently been decided by the supreme court of the United States in the cases of *Adams Express Co. v. Croninger*, 226 U. S. 491, *C., B. & Q. Ry. v. Miller*, 226 U. S. 513, and *Chicago, St. P. &c. Ry. v. Latta*, 226 U. S. 519.

In the Croninger case a diamond ring worth $125 was shipped under a bill of lading issued on the basis of a valuation of $50. In the Miller case a stallion

worth $2000 was shipped under a valued live stock contract in which the value of the animal was given as $200. In the Latta case two horses were shipped at a declared value of $100 each. Their full value was not disclosed. In each case the shipment was made at the lower valuation in order to obtain a lower rate as shown by schedules of graduated charges for transportation filed with the interstate commerce commission. In each case the bill of lading limited the liability of the carrier to a sum not greater than the value of the article therein stated. In each case the action was brought for the full value of the property shipped, under a state law forbidding the carrier to limit its common-law liability. The scope of the decisions is sufficiently indicated by the following extracts from the headnotes prefixed to the report of the Croninger case:

"Since the decisions of this court in *Chicago, Milwaukee & St. Paul Railway v. Solan,* 169 U. S. 133, and *Pennsylvania Railroad v. Hughes,* 191 U. S. 477, Congress has by § 20 of the Hepburn Act of June 29, 1906, 34 Stat. 584, c. 3591, known as the Carmack amendment, legislated directly upon the carrier's liability for loss of and damage to interstate shipments, and this legislation supersedes all regulations and policies of a particular state upon the same subject.

"Only the silence of Congress authorizes the exercise of the police power of the state upon the subject of contracts with carriers for interstate shipments, and when Congress exercises its authority the regulating power of the state is at an end.

"In enacting the Carmack amendment it is evident that Congress intended to adopt a uniform rule as to the liability imposed upon interstate carriers by state regulations of bills of lading and to relieve such contracts from the diverse regulations to which they had theretofore been subject.

"A common carrier can not exempt himself from liability for his own negligence or that of his employees, but the rigor of this rule may be modified by a fair, reasonable and just agreement with the shipper which does not include exemption from such negligence; and

34—89 KAN.

the right to receive compensation commensurate with the risk involves the right to agree upon rates proportionate with the value of the property transported.

"An interstate carrier may, by a fair, open and reasonable agreement, limit the amount recoverable by the shipper to an agreed value made for the purpose of obtaining the lower of two or more rates proportioned to the amount of risk.

"A limitation of liability based upon an agreed value to obtain a lower rate does not conflict with any sound principle of public policy; and it is not conformable to plain principles of justice that a shipper may understate value in order to reduce the rate and then recover a larger value in case of loss.

"The provisions of the Carmack amendment are not violated by a plain provision in a bill of lading basing the charges on value of article transported and charging higher rates for increasing liability as value is declared." (Headnotes, 226 U. S. 491.)

The result is that the instruction requested was properly refused and the instruction given correctly stated the law.

Two minor questions are presented, neither of which requires special discussion. The plaintiff did not receive final instructions regarding the car until November 29. It went forward on December 2, and the refusal to pay before suit was brought was not based on the fact that the shipment was unduly delayed. Under the circumstances disclosed by the record, the defendant is not in a position to claim that the amount of the verdict is not warranted by the evidence.

The judgment of the district court is affirmed.